Clell E. MASON and Ruby C. Mason,
Plaintiffs in Error,

v.

Broneta Davis EVANS, Clyde R. Evans, and
Sunray Mid-Continent Oil Company, a for-
eign corporation, Defendants in Error.

No. 40579.

Supreme Court of Oklahoma.

Nov. 2, 1965.

Rehearing Denied Feb. 1, 1966.

IRWIN, Justice.

This action concerns the ownership of approximately 150 acres of accreted land. Record title is in the name of Clell E. Mason and Ruby C. Mason, plaintiffs in error, hereinafter referred to as plaintiffs. Defendant Broneta Davis Evans, hereinafter referred to as Broneta, claims ownership of the land by reason of adverse possession by her predecessors in interest. Broneta's husband, defendant Clyde R. Evans, claims no right, title or interest in the land. Defendant Sunray Mid-Continent Oil Company, claims that it has an existing oil and gas lease on the property which was executed by Broneta Davis Evans and Clyde R. Evans.

Plaintiffs commenced this proceeding to quiet title to the 150 acres of accreted land and to cancel Sunray's oil and gas lease. Defendants denied plaintiffs' ownership and by way of cross petition, sought to quiet title on the grounds that defendant Broneta's predecessors in interest had acquired the legal and equitable fee simple title to the land by reason of adverse possession for the required prescriptive period.

The trial court, in its conclusion of law, found that Broneta's predecessors in interest, had at all times since September, 1929, held the exclusive, hostile, open, notorious, adverse and uninterrupted possession of the land for more than 15 years and the same was not questioned by plaintiffs or their predecessors in interest and was sufficient in law to ripen into and vest in Broneta's predecessors, a complete, legal, fee simple title on or about September 1, 1944.

Judgment was rendered for defendants and plaintiffs have appealed from the order overruling their motion for a new trial.

## FACTS

Prior to 1929, plaintiffs' and defendants' predecessors in interest each owned lots on the south bank of the South Canadian River. Although these lots are described differently in the record before us, and are in fact in different sections, for clari-

Porta & Weaver, El Reno, C. D. Van Dyck, Jr., Chickasha, for plaintiffs in error.

John F. Curran, Tulsa, McElroy & Vaughn, Chickasha, Tolbert & Gillespie, Hobart, for defendants in error.

fication, we will refer to these original lots as Lots 1, 2, and 3, with Lot 1 being on the west side, Lot 2 in the middle, and Lot 3 on the east side. Plaintiffs' predecessors in interest owned Lot 2 and defendants' predecessors owned Lots 1 and 3.

By gradual movement of the South Canadian River to the north, and before 1929, certain lands accreted to all three lots to the north. Approximately 150 acres accreted to Lot 2, with a lesser amount accreting to Lots 1 and 3. By such accretion the south bank of the river forms an oval-like boundary on the west, north and east side of the accreted lands. We will refer to the accreted lands to the three lots respectively as Lot 1A, Lot 2A and 3A. The 150 acre tract in dispute will be referred to as Lot 2A, and it lies between Lot 1A and Lot 3A.

In 1946, plaintiffs acquired record title to Lot 2 and its accreted land. The accreted land has never been cultivated and has been used only for pasture. In 1951, Broneta inherited whatever right, title and interest her deceased husband, Tod Davis, had in the 150 acres of accreted land. In view of Broneta's admissions on cross-examination that since the death of her husband in 1951, she had not pastured any cattle on the land; that she had seen plaintiffs' cattle being pastured thereon from time to time; and other evidence herein set forth and the trial court's conclusions that Broneta's predecessors' interest became fixed in September, 1944; it was incumbent upon Broneta to prove that her predecessors in interest had held the disputed tract adversely from September, 1929, to September, 1944.

Defendants do not contend that the 150 acres involved did not accrete to Lot 2. They contend, however, that their predecessors in interest, being the owners of the accreted lands on both sides of Lot 2A, began their adverse possession and claim to Lot 2A in September, 1929, and held the same adversely for the required prescriptive period. As heretofore stated, the trial court sustained this contention as it found

that defendants' predecessors in interest acquired the legal and fee simple title to the property in September, 1944, by holding such land adversely for the required prescriptive period.

To bring the precise facts and issue in focus, we will first consider the evidence adduced by defendants.

As heretofore pointed out, for clarification, we are not using the record legal description of the lots pertinent to this action but are calling them Lots 1, 2, and 3, with the accreted lands being referred to respectively as Lots 1A, 2A and 3A.

In 1929, Brad Davis, Broneta's father-in-law, acquired title to Lots 1 and 3, and the accreted lands to these lots, the same being Lots 1A and 3A. A Mr. Lumpkin testified that in September, 1929, he worked for Brad; that he helped take care of his cattle; that he helped to sow clover and grass on Lots 1A, 2A and 3A; that he built a fence between the lots and the river; that there was a barbed wire fence between Lot 2 and the accreted land to Lot 2; that he built a fence, running north and south, separating Lots 1A and 2A and another fence separating Lots 2A and 3A; that parts of Lot 1A and 3A were cultivated and used for growing crops and Lot 2A was used only for pasture purposes; that Brad's cattle were pastured on Lot 2A; that he built a corral which was located partly on Lot 2A and Lot 3A and loaded cattle from it; that he worked for Brad until Brad died in 1936, and he continued to work for Brad's son, Tod Davis (Broneta's deceased husband who died in 1951); that he worked for Tod and Broneta until the fall of 1936 and from the time he started working for Brad in 1929, until he stopped working for Tod and Broneta in the fall of 1936, they pastured and were in possession of Lot 2A and nobody else used it or claimed it.

It is to be noted that Mr. Lumpkin's testimony covers a period of time from September, 1929, to the fall of 1936. Although he went back on the land later to go fishing, his testimony does not tend to establish who

was in possession of or who was running cattle on Lot 2A from the fall of 1936 to September, 1944.

Mrs. Stella Davis Britton, the former wife of Brad Davis and Broneta's mother-in-law, substantiated the testimony of Mr. Lumpkin concerning the building of fences and using Lot 2A for pasture purposes. She stated that Brad died in 1936, and that she and her son inherited the property; that Brad's estate was probated and in an exchange of deeds in 1937, her son Tod obtained title to Lots 1A, 2A, 3 and 3A, and she obtained other land; and that she did not have occasion to observe the land after 1937 until the fall before the trial.

It is to be noted that Mrs. Britton's testimony covers only the period of time beginning September, 1929 and ending in 1937.

A Mr. Conn testified that he had hunted on the 150 acre tract but his testimony does not tend to establish that Broneta's predecessors in interest were in possession of the land between 1929 and 1944.

Mr. Rudy Maples testified that he rented land from Brad and Tod Davis (not the land in question) between 1933 to 1940; that during this time Brad and Tod ran cattle on Lot 2A; and that during this period he did not know of anybody else running cattle on the tract.

It is to be noted Mr. Maples' testimony would not tend to establish any adverse possession by Broneta's predecessors in interest after 1940.

Mr. Claude Maples testified that he started working for Broneta and Tod Davis in September, 1938, and stopped in July, 1941, and during the time nobody else used the 1950 acre tract except the Davises, and that he was away in Ohio from 1941 to 1945. He did state, however, that he returned on July 4, 1943, and went out to the Tod Davis ranch and that he saw some cattle on Lot 1 and Lot 1A, but wasn't for sure whether there were any cattle on the 150 acre tract. In 1947, he was "pretty sure" he saw Tod's cattle on the disputed strip.

It is to be noted this testimony covers the period of time between September, 1938, and July, 1941, and his other testimony is rather inconclusive.

The testimony of Frank Wall covered a period of time in 1949, and he stated he helped Tod calf a heifer on the disputed tract and saw no other cattle. The testimony of Mr. J. R. McKelvey covered the years of 1936 and 1937. The testimony of George Tidwell covered the period of time between 1944 and 1946; he said he thought the Stinchcombs and Tod Davis both had cattle running on the disputed tract but he wasn't positive in his statement. His testimony does not tend to establish who had possession of the disputed tract in 1944. The testimony of E. H. Masonhall discloses that he saw Tod's cattle on the disputed tract in 1948 and 1949. The testimony of Ernest McKelvey covered the years 1936 and 1937.

Mr. Morrissey testified that he started to work for Brad Davis in January, 1936, and worked for him until Brad died in February, 1936; that he started working for Tod and worked for him until August, 1942; that during these periods, Brad and Tod Davis pastured their cattle on Lots 1A, 2A and 3A, and nobody else used the land for pasture. He stated he went back in 1949 and saw Tod's cattle on the disputed land.

Broneta testified that she started working for Brad, her father-in-law in 1928; and that Brad constructed the fences and planted seed. Her testimony substantiated the testimony of Mr. Lumpkin with reference to use of the land. She testified that from the time the land was fenced in 1929, Tod or Brad Davis had complete control and possession of Lots 1A, 2A, and 3A, and claimed it; that since the death of Brad and the probate of his estate in 1937, she and Tod, until his death, had paid the taxes on the 150 acre tract and that after his death she continued to pay the taxes; that nobody ever questioned their right to use the land or that the land was not theirs.

It is to be noted that the only testimony offered by defendants as to possession and use of the land between August, 1942, (the testimony of a Mr. Morrissey included this date) and September, 1944, was that of Broneta. Defendants offered no other testimony covering this period which would tend to establish their possession of the property.

We will now turn to the evidence offered by the plaintiffs.

Lee Stinchcomb testified he first became acquainted with the land in 1938, when his father, Ivan, was leasing the land from a Mr. Douglas; that he moved to the south of Lot 2A in 1938; that his folks ran cattle on the disputed tract and nobody else did; that his father purchased Lot 2 in 1940; that Tod Davis operated Lots 1, 3, 1A and 3A; that to his knowledge Tod Davis never ran cattle on Lot 2A from the time the Stinchcombs moved there in 1938, until they moved away in 1947; that the Davises did not use Lot 2A for pasture but they did help keep up the fences; that he had no knowledge that the Davises claimed it between 1938 and 1947; that they had rented the land for pasture and had received pasture rent; that his father died in February, 1945, and he was the administrator of his estate; that he collected $318.00 and $476.00 in rent due his father when he died. Introduced as exhibits was Lee's supplemental account as administrator, dated December 21, 1945, disclosing pasture rental received in the sum of $476.00; and also an account dated October 26, 1945, showing pasture rental received in the sum of $318.-00; Lee further stated that the Davises never claimed any portion of the pasture rental. Lee testified that a Mr. Duerksen had some cattle on the disputed tract off and on all the time he lived on the property and that he paid pasture rental.

In the cross-examination of Lee Stinchcomb, defendants sought to show that when the Stinchcombs purchased Lot 2, that they did not claim the accreted land to Lot 2, the same being the disputed land in question. In this connection Lee stated, "We didn't claim to own that (Lot 2A) and he (Douglas, who sold Lot 2 to the Stinchcombs) didn't claim to own that (Lot 2) land."

On re-examination by plaintiffs' counsel, Lee was asked if he meant that he knew of no effort his father made to claim the land. His answer was that, "My understandable knowledge all the time I was around there, lived there, that was accretion land and that was it, of course, you wouldn't own accretion land; accretion land you wouldn't own. You'd have a deed to it, and we didn't claim it."

"Q. You don't know whether you would or not, do you?

"A. We claimed the grazing rights, if that's what you mean, because we pastured it all.

"Q. You are not trying to determine here that your father didn't own that as a matter of law?

"A. No, I know nothing about that at all, * * *."

Lee's mother, Mrs. Hutchinson, the former wife of Ivan Stinchcomb, testified that they moved on the farm in early 1938; that they first leased the land from Mr. Douglas; that they pastured the 150 acre tract in question; that she knew her cattle pastured clear to the river on the north because she had to go after them once a day; that before they leased the land from Mr. Douglas she knew the 150 acre tract was accreted land and before she and her husband leased the land they walked over it; and that they would not have leased or purchased the land unless the accreted land was included; that the Davises did not run cattle on the 150 acre tract while she was there; that a Mr. Duerksen ran cattle on the tract in 1943 and paid the rent; and that her son was injured roping their cattle on the disputed tract in 1943. Mrs. Hutchinson said she left the farm in 1943 and that the Davises had never pastured the land to her knowledge from the time she went there in 1938 to the time she left.

Plaintiffs' witness, a Mr. Duerksen, testified that he was acquainted with the land in controversy and that Mr. Douglas pastured the tract in question when he owned it; that he had rented the tract in dispute from Mr. Stinchcomb and paid him pasture rent for four different summers; that the first time he rented it from Mr. Stinchcomb was the year after Stinchcomb purchased it; that he and a Mr. Potter had some heifers there one year and paid rental to Mr. Stinchcomb during his lifetime; that Tod Davis never asked him for pasture rental while he ran his cattle. Mr. Duerksen said he and Lee Stinchcomb rented the land together one year from Lee's father and ran cattle on the disputed tract.

Clell Mason testified he purchased the property in 1946; that at the time of the purchase Lee Stinchcomb was running cattle on it; that he had the land surveyed and started paying taxes on the accreted land; that since he purchased the land in 1946, the Davises had never run a hoof of cattle on the 150 acre tract in dispute except some that broke through the fence; and that he had been exercising dominion and control over the land in dispute since he purchased it and nobody ever questioned his right to it.

Carl Mason, son of Clell Mason, was called as a rebuttal witness by plaintiffs. He testified his father started pasturing the disputed tract in 1946, and had always used it and that he never saw the Davis cattle on it.

The record also discloses that after Brad's death and his estate was probated, his son, Tod Davis, started paying the taxes on the disputed tract in 1937. After Tod's death in 1951, his wife, Broneta, continued to pay the taxes. In this connection, it is to be noted that the record owners of Lot 2 paid the taxes on Lot 2 and after Clell Mason acquired a deed to Lot 2 and the accreted lands thereto (Lot 2A) in 1946, he paid the taxes on Lot 2A in addition to the taxes on Lot 2 and continued to pay the same.

## CONCLUSION

In considering the force and effect of the payment of taxes on Lot 2A by defendants we find in Anderson v. Francis, 177 Okl. 47, 57 P.2d 619, we held:

"The payment of taxes is not a controlling circumstance, but is one of the means whereby a claim of ownership is asserted, and a failure to pay taxes weakens a claim of ownership by adverse possession."

Under the circumstances herein presented, there were no taxes due on Lot 2A when Tod and Broneta paid the taxes thereon. Plaintiffs' predecessors in interest paid all the taxes on Lot 2, and the payment of taxes included the taxes for the accreted land thereto, or Lot 2A. See Criswell v. Wilson, 198 Okl. 47, 175 P.2d 87.

Although payment of taxes by defendants constitutes evidence of claim of ownership, the payment thereof is not necessarily controlling in determining claim of ownership or possession.

The trial court found that in September, 1929, Brad Davis entered into possession of the disputed tract, under claim of right, and that he and his successors in interest held the same adversely for fifteen years and acquired the legal and equitable title by prescription in September, 1944.

In reviewing the evidence, we find little dispute concerning who exercised control and dominion over the disputed tract from September, 1929, to the time of death of Brad Davis in 1936. During this period, Brad fenced the tract along the river on the north, and on the east and west sides. The fences along the east and west side separated Lot 2A from Lots 1A and 3A. Brad cultivated Lots 1A and 3A and pastured Lot 2A. He built a corral on Lot 3A and this corral extended over on Lot 2A. Although Brad did not have record title to Lot 2A and did not pay taxes thereon, he had it surveyed and used it and there is little evidence, if any, that others used the disputed tract during this period or ever questioned Brad's control and dominion over the same.

After Brad's death in February, 1936, his son, Tod, and Tod's wife, Broneta, continued to exercise dominion and control over the disputed tract and there is little dispute, if any, as to their actions and conduct during the remainder of 1936 and 1937. However, from the early part of 1938 to August, 1942, we find a great deal of conflict as to who claimed the disputed tract; who was in possession of it; and who exercised control and dominion over it. Certain witnesses for defendants testified that Tod and Broneta pastured the disputed tract and nobody else used it or questioned their rights to it. On the other hand, plaintiffs introduced evidence that the Stinchcombs leased Lot 2 and other lands from the then owner and moved into a house to the south of the disputed tract in the early part of 1938. Plaintiffs' evidence was to the effect that they had possession of the disputed tract, pastured it, and that Tod and Broneta neither used the tract in question nor claimed it during this period. The Stinchcombs purchased Lot 2 in 1940, and Lee Stinchcomb's mother testified that she understood that the accreted land went with the farm and that she and her husband would not have leased or purchased the farm if the accreted land had not been included " * * * because we wouldn't have had any pasture for our cows."

The only evidence adduced by the defendants covering the period of time between August, 1942, to September, 1944, is the testimony of Broneta Davis. Although a Mr. Claude Maples said he was in the general area on July 4, 1943, and saw Tod's cattle on Lot 1 and Lot 1A, his testimony did not place Tod's cattle on the disputed tract or tend to establish that Tod had possession of the disputed tract. Broneta's testimony was to the effect that she pastured the disputed tract, had possession of the same and nobody else used it, claimed it, or questioned her right to it. On the other hand, we have the testimony of Lee Stinchcomb and his mother that they not only pastured the disputed tract, but claimed it, had possession of it, and nobody else used

it, claimed it, or questioned their rights to it. They also testified that they leased the disputed tract to a Mr. Duerksen for pasture purpose and received rental from him. Mr. Duerksen testified that he pastured his cattle on the disputed tract and paid the pasture rental to the Stinchcombs. In addition, plaintiff introduced in evidence two supplemental accounts filed in the estate of Lee Stinchcomb's father in 1945. These accounts disclose that the Stinchcombs had in fact received $476.00 and $318.00 for pasture rental. The exact period that these rentals covered and the exact land rented are not shown in the account, but Lee testified that said rentals were accrued rentals and covered a period of time before his father's death in February, 1945, and the disputed tract was rented.

There is very little departure between the evidence submitted by plaintiffs and defendants for the period between September, 1944, to 1946, and that submitted by them for the period between August, 1942, to September, 1944. However, in 1946, plaintiffs purchased the property, had the land surveyed and started paying taxes on Lot 2A separate from the taxes on Lot 2. Plaintiffs' evidence was to the effect that they used the land and claimed it and that defendants neither used nor claimed it. Defendants' evidence was in conflict with this.

In examining the entire record we can only conclude that neither the plaintiffs' predecessors in interest nor Tod and Broneta had exclusive control and possession of the disputed tract from the early part of 1938 to September, 1944, but the clear weight of evidence discloses that control and possession of the disputed tract during said period, or at least part of said period, were "mixed" or "scrambled".

 In Norman v. Smedley, Okl., 363 P.2d 839, we held:

"The party relying on a title by adverse possession has the burden of proving all the facts necessary to establish such a title. Adverse possession is to be taken strictly, and every presumption is

in favor of a possession in subordination to the rightful owner. Title by adverse possession, therefore, must be established by clear and positive proof. It cannot be made out by inference. All of its constituent elements must be established. Thus it is necessary to prove an actual, open, notorious, exclusive, and hostile possession for the full statutory period."

In the above case we cited with approval Anderson v. Francis, 177 Okl. 47, 57 P.2d 619, 620, wherein we held:

"Title to land cannot be acquired by adverse possession unless the possession is open, notorious, hostile, and exclusive, and it is also essential that such possession, in order that it may ripen into title, should be shown to be continuous and uninterrupted for the full statutory period. The moment the possession is broken it ceases to be effectual, because as soon as, and as often as, a break occurs the law restores the constructive possession of the owner."

In Collins v. Smith, Okl., 372 P.2d 878, we said:

" * * * plaintiff had the burden of proving every fact necessary to prove his adverse possession. Among these elements is that of exclusiveness. In the case of Howard v. Stanolind Oil & Gas Co., 197 Okl. 269, 169 P.2d 737, this court said in the body of the opinion: 'Adverse possession, in order to ripen into title, must be exclusive. "Exclusive possession" means that the disseizor must show an exclusive dominion over the land and an appropriation of it to his own use and benefit. Two persons cannot hold one piece of property adversely to each other at the same time, and where two persons have entered upon land, he who has the better title will be deemed to be in possession thereof. It is therefore essential that the possession of one who claims adversely should establish as an ouster of the true owner because in

the absence of ouster, the title draws to itself the continuous possession of the property. Possession not amounting to disseizin is insufficient. 1 Am.Jur. 875, 876.

" 'Where the possession of land is mixed, the legal seisin is according to the legal title. Deputron v. Young, 134 U. S. 241, 10 S.Ct. 539, 33 L.Ed. 923.'

"The most that can be said for plaintiff's proof is that the possession, if he had any, was mixed or scrambled. Under the facts and circumstances in this case it could not be classed as exclusive. * * *"

Since we have determined that the clear weight of the evidence discloses that control and possession of the disputed tract between September, 1929, and September, 1944, was not in Broneta's predecessors in interest, but that the clear weight of the evidence discloses that during such period, or at least part of it, control and possession were "mixed" or "scrambled", defendants have failed to prove adverse possession for the required prescriptive period.

Judgment of the trial court is accordingly reversed with directions to vacate such judgment and enter judgment for plaintiffs.