**David L. JAMES and Ollen James, Plaintiffs,**

**Bruce Wright, Mary Ben Wright, and Anna Mae Stovall, Intervening Plaintiffs,**

v.

**P.P. LANGFORD, Linda Langford (Mrs. Jerry G.) Moore, Desiree Lynn Langford, Merissa Lafawn Langford, Shirley Langford, and the United States of America and the Commissioners of the Land Office, State of Oklahoma, Defendants.**

**No. CIV–75–461–D.**

United States District Court, W.D. Oklahoma.

May 19, 1981.

738

Charles Nesbitt, Oklahoma City, Okl., James F. Howell, Midwest City, Okl., for intervenors.

John E. Green, Asst. U.S. Atty., Oklahoma City, Okl., Frank J. Douthitt and Robert F. Mitchell, Henrietta, Tex., Roland Tague, R.R. Williamson, Jr. and Clyde E. Fosdyke, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

This is a declaratory judgment action to quiet title to real property lying in the bed of the Red River between Jefferson County, Oklahoma, and Clay County, Texas. The Court has subject matter jurisdiction over Plaintiffs' claims against the individual Defendants pursuant to 28 U.S.C. § 1332 by reason of diversity of citizenship and amount in controversy and over Plaintiffs' claims against the Defendant United States of America pursuant to 28 U.S.C. §§ 1346(f) and 2409a. An extensive non-jury trial has been conducted herein and this matter is now ready for decision by the Court.

It appears from the record before the Court in this case that Plaintiffs David L. James and Ollen James (hereinafter referred to as Plaintiffs) originally commenced this action and are the surface owners of certain riparian lands on the Oklahoma side of the Red River in Jefferson County, Oklahoma, including all of Section 13, Township 5 South, Range 9 West of the Indian Meridian and Lots 1, 2, 3 and 4 of Section 24 of the same township. Plaintiffs claim ownership of the bed of the Red River to the south (west)[1] bank thereof opposite their land in Section 13 and to the medial line of the Red River bed opposite their lands in Section 24. The Court allowed the Intervening Plaintiffs, Bruce Wright, Mary Ben Wright and Anna Mae Stovall (hereinafter referred to as Intervenors), to intervene in this case as parties plaintiff as they own the minerals under Plaintiff's land in Section 24 and their interest is co-extensive with Plaintiffs' surface ownership in said section. The Commissioners of the Land Office of the State of Oklahoma (hereinafter referred to as Commissioners) were made a party to this case and are aligned with the Plaintiffs as the Commissioners own the minerals under Plaintiffs' land in Section 13 and any rights retained under a certificate of purchase issued to Plaintiffs thereon, and the Commissioners' mineral ownership is co-extensive with Plaintiffs' surface ownership in said section.

The Defendant United States of America claims ownership of the Red River bed from the medial line to the south (west) bank opposite all lands in Sections 13 and 24 as trustee for certain Indian tribes. Defendants P.P. Langford, Linda Langford (Mrs. Jerry G.) Moore, Desiree Lynn Langford, Merissa LaFawn Langford and Shirley Langford (hereinafter referred to as Defendants Langford) own lands on the Texas side of the Red River directly opposite Plaintiffs' lands in both sections and claim ownership to the south (west) bank of the Red River.

In *Oklahoma v. Texas,* 256 U.S. 70, 41 S.Ct. 420, 65 L.Ed. 831 (1921), the United States Supreme Court determined that the boundary between Oklahoma and Texas, as fixed by the Treaty of 1819 between the United States and Spain, was the south bank of the Red River. *See United States v. Texas,* 162 U.S. 1, 16 S.Ct. 725, 40 L.Ed. 867 (1896); *see generally* L. Miles, "Southern Boundary of Oklahoma," in *Boundaries of Oklahoma* 27 (J. Morris ed. 1980). Later in the course of the *Oklahoma v. Texas* litigation, the Supreme Court concluded that:

[T]he cut bank along the southerly side of the sand bed constitutes the south bank of the river, and that the boundary is on and along that bank at the mean level of the water when it washes the bank without overflowing it.

The boundary as it was in 1821, when the treaty became effective, is the boundary of to-day, subject to the right application of the doctrines of erosion and accretion and of avulsion to any intervening changes.

---

1. This dual terminology is used because generally the Red River runs east and west with north and south banks of the River and the reported cases refer to the north and south banks of the River. However, because of a curve in the Red River in the area involved in this case, the River generally runs north and south and hence we are actually involved with east and west banks in this case.

*Oklahoma v. Texas,* 260 U.S. 606, 636, 43 S.Ct. 221, 226, 67 L.Ed. 428 (1923); *see Oklahoma v. Texas,* 261 U.S. 340, 341–342, 43 S.Ct. 376, 377, 67 L.Ed. 687 (1923).

■ In view of the foregoing, it is clear that the primary issue in this case is the location of the south (west) bank of the Red River in the disputed area.[2] In this connection, Plaintiffs contend that the south (west) bank in this area is the so-called "wheat field bank" which is a well-defined embankment immediately to the east of the presently cultivated lands of Defendants Langford on the Texas side of the river. Defendants Langford contend that the south (west) bank is along a well-defined bank immediately to the west of and adjacent to the present water course of the river. The area in dispute between the two lines encompasses approximately 900 acres.

Defendants Langford further contend that the lands between the two lines described above have been added to their lands by the processes of accretion and/or reliction. Plaintiffs assert that there has been no accretion by which the boundary has moved from the line described above, and if the course of the river has been altered, it has been the result of avulsion caused by embankments and bank stabilization jetties constructed in connection with the erection and protection of State Highway 79 bridge across the Red River near the north boundary of the lands involved herein. Furthermore, Plaintiffs claim that an avulsion occurred in the course of a major flood in 1908 causing the water course of the river to move suddenly eastward from the "wheat field bank" a dis-

tance of approximately one-half mile and that such an avulsive change in the water course did not change the south (west) boundary of the river as it then existed. Plaintiffs thus claim that the boundary remained along the "wheat field bank" where the river ran prior to the avulsive movement of the water course.

Defendants Langford deny the Plaintiffs' avulsion claims and assert that if there was an avulsion, Defendants Langford have occupied the lands in dispute and practiced husbandry and generally used the lands for the grazing of livestock for a sufficient period of time to have acquired the same by adverse possession pursuant to the applicable statutes in both Texas and Oklahoma.

Upon consideration of the pleadings, the oral and documentary evidence received at trial and the arguments, briefs and contentions of counsel, the Court makes the following findings of fact and conclusions of law in this case which are incorporated herein pursuant to Rule 52, Federal Rules of Civil Procedure:

The portion of the Red River lying between Oklahoma and Texas flows in a generally eastward direction, slightly to the south, but the flow in the area of the disputed lands involved in this case is virtually north to south. The numerous aerial photographs and maps before the Court indicate that the present watercourse in the area generally follows a serpentine path between well-defined outer banks which range from one to two miles apart. The low water channel of the river meanders irregularly between the banks, frequently braiding into

2. The parties have agreed herein that the term "bank" in reference to the Red River bank shall mean the bank as defined by the United States Supreme Court in *Oklahoma v. Texas,* 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428 (1923). Said case provides in pertinent part as follows:

[T]he bank intended by the treaty provision is the water-washed and relatively permanent elevation or acclivity at the outer line of the river bed which separates the bed from the adjacent upland, whether valley or hill, and serves to confine the waters within the bed and to preserve the course of the river, and that the boundary intended is on and along the bank at the average or mean level

attained by the waters, in the periods when they reach and wash the bank without overflowing it. When we speak of the bed, we include all of the area which is kept practically bare of vegetation by the wash of the waters of the river from year to year in their onward course, although parts of it are left dry for months at a time; and we exclude the lateral valleys, which have the characteristics of relatively fast land, and usually are covered by upland grasses and vegetation, although temporarily overflowed in exceptional instances when the river is at flood.

260 U.S. at 631–632, 43 S.Ct. at 225.

multiple streams and washing the outer banks at several points along the course of the river. The meander loops tend to move downstream through the process of erosion on the outer edges of the loops where the water flows faster than at the inner edges. Also, major fluctuations in the water level cause significant changes in the location of the channel over short periods of time. The Oklahoma bank of the Red River in the disputed area is a prominent bluff that rises vertically some forty feet or more. The present active channel of the river runs along this bank for most of the distance adjacent to the disputed lands. This channel bed consists of loose sand and is completely devoid of vegetation. It is bounded by low banks, cut into the sand bed of the river and ranging upward to approximately three to four feet high above the channel bed. In many areas, the channel has no discernible vertical banks and only a gradual slope as a boundary. The disputed lands extend westward from the channel to the wheat field bank nearly a mile to the west where the surface of the land rises sharply approximately ten feet. The wheat field bank is an erosion bank, formed by the cutting action of the river when the active channel ran along that bank, and this bank marks the eastern boundary of a cultivated wheat field comprised of land formed from deposits by river action in recent past geologic time, but which now possesses all of the characteristics of fast land. This field has been under constant cultivation for many years and is overflowed only in periods of extreme flooding. To the west of the wheat field is another prominent bank characterized by an outcropping of bedrock rising some twenty feet above the wheat field.

The State of Texas surveyed the lands on the west side of the Red River at this point in 1861, which survey extended to the wheat field bank and was the basis of a patent originally granted to one Reuben Brown. The present wheat field bank closely approximates the 1861 survey bank except that the present wheat field bank opposite the south half of Section 24 is west of the original survey line, resulting from

erosion of the wheat field bank occurring since the 1861 survey. In 1874, the United States surveyed along the Oklahoma bank at which time the east bank of the Red River was to the west of its present location. The present active channel lies almost completely upon lands east of the Oklahoma bank according to the 1874 survey.

The uncontroverted evidence before the Court indicates that prior to 1908, the active channel of the river ran along the wheat field bank, and the riverbed east of that location was covered with vegetation, including some large trees. A major flood occurred in 1908, which resulted in the movement of a large amount of sand downstream or "scouring" of the riverbed, and washed out the vegetation and timber located there. When the flood waters receded several days later, there was a new active channel, approximately one-half mile east of the previous location. The intervening area between the old and new channels had become a large sand bar, completely scoured of vegetation. The new active channel crossed the disputed lands about halfway between the wheat field bank and the present channel location. Vestiges of the pre-1908 channel and the channel which succeeded it are still visible both from aerial photographs and engineering profiles in evidence before the Court. A single large elm tree, estimated by some witnesses to be over 100 years old, is located approximately 1,000 feet east of the wheat field bank. This tree is by far the largest and oldest in the area, and its location is consistent with the presence of a prior channel west of it in the past. The average age of vegetation on the disputed land is about thirty-five years or less.

Similarly, prior to 1935, the active channel opposite the south line of Section 24 was located about three-fourths of a mile west of the Oklahoma bluff. The fast land between the bluff and channel was covered with timber, and parts thereof were being actively cultivated in annual crops. A major flood occurred in 1935, which washed out the crops and timber, along with the fast land in that area. After the flood

waters receded, the channel had moved eastward about one-half mile to a point approximately 200 yards west of the Oklahoma bluff. Vestiges of this previous channel also are visible on aerial photographs before the Court. Thereafter, the channel migrated slowly to its present location.

In 1941 a railroad bridge constructed in the early 1920's across the Red River at a point near the south boundary of Section 13 was washed out in a major flood and has never been replaced. Vestiges of the former railroad right-of-way are still visible. In 1940, a highway bridge was constructed at a location which bisects the westerly extended north line of Section 13 in a southwest to northeast direction, approximately along the north edge of the disputed lands. The bridge structure consists of a major steel truss bridge approximately 2,200 feet long extending westward from the Oklahoma bluff, and spanning the present active low water channel. Extending westward from the bridge is an embankment some 1,800 feet long on the top of which the highway is constructed. Then to the west is a "relief structure" or smaller bridge, about 1,000 feet long, extending from the west edge of the embankment to the wheat field bank. The relief structure, (or the west bridge) was designed to permit the waters of the river to utilize a definite high water channel along the wheat field bank in periods of substantial flow and thereby provide "relief" or protection for the bridge and embankment against destructive erosion. The right-of-way secured by Texas for the highway extends only to the wheat field bank.

At the time the highway bridge was constructed in 1940, the active channel ran close to the Oklahoma bluff for a considerable distance both above and below the bridge location. Since that time, the channel has meandered laterally to the west a distance of more than a mile immediately above the bridge, where it actively impinges upon the wheat field bank. From that point, the channel makes an abnormally tight meander loop to a point immediately north of the embankment between the two bridges and extends in a slightly northeast-erly direction to a point where the channel again sharply changes direction to go under the main bridge. Commencing as early as 1955, the Oklahoma and Texas Highway Departments have jointly undertaken bank stabilization projects designed to slow the process of erosion by which this meander loop immediately north of the highway threatens to break through and cut a new channel along the wheat field bank passing under the west bridge. To this end, a series of wooden jetties was constructed, each of which extended from the Texas bank diagonally into the river current in an attempt to lessen the severe erosion along the outer edge of the meander loop. Most of these jetties were washed away in a flood in 1957, and have since been replaced from time to time by a series of steel jetties lashed together with wire cables and placed in the water north of the west bridge and along the north edge of the embankment between the two bridges. In addition, stone jetties were built extending into the channel to deflect the water away from the west bridge and embankment and riprap was frequently dumped on the north edge of the embankment. In July, 1980, many of these jetties were removed by river action, and the embankment was rapidly eroded to a point no more than four feet from the concrete highway surface, requiring emergency dumping of large quantities of stone along the embankment to prevent the cutting of a new channel at that point. In the absence of these continuous bank stabilization projects, it is likely that a new active channel would have been cut at the approximate location of the west bridge, and that the low water channel would presently be located somewhere on the disputed land, probably along the wheat field bank.

The soil throughout the disputed lands consists of loose sand at least twenty feet deep and is substantially identical to that comprising the bed of the active channel while the soil profile of the wheat field and its bank consists of dark colored sandy loam. The sand bank at the west edge of the present low water channel has no permanence, and yields readily to the action of

the water. In this regard, it appears that a twenty-foot bank created by dredging operations in 1974 along the west edge of the low water channel was almost completely obliterated by 1976. The vegetation which covers most of the disputed lands consists of grasses and weeds, scattered brush, salt cedars and some trees. This vegetation is indistinguishable from that which grows in various places throughout the riverbed. The vegetation in the riverbed is periodically destroyed by floods or migrations of the active channel, but soon re-establishes itself outside the current active channel. As the active channel has been stabilized in its present location below the bridge for more than forty years, it appears that the vegetation on the disputed lands has been protected by the embankment and supporting stabilization projects and has had an opportunity to grow undisturbed for that period and consequently the trees are larger and the ground cover thicker. The vegetation is sparse to virtually non-existent in the west channel along the wheat field bank, where it is covered by water more frequently.

Upon applying the *Oklahoma v. Texas* definition of the term "bank" set out at footnote 2 *supra* to the facts herein as found by the Court, the Court determines that the south (west) boundary bank in this case is the "wheat field bank." Said bank is relatively permanent, particularly in comparison to the bank claimed by Defendants Langford to be the boundary bank, and is part of a continuous bank on the south (west) side of the Red River which contains the braids of the river and marks the outer limits of the meanderings of the low water channel. It is part of a bank which is washed by the waters of the active channel at several points above and below the disputed lands and serves to confine the waters of the river within the bed and thereby preserve the course of the river. Furthermore, there is evidence before the Court that all of the lower banks lying between the "wheat field bank" and the active channel, including the bank Defendants Langford assert to be the south (west) boundary bank, as well as the disputed land are completely inundated several times a year, even during relatively dry years.[3] Also, it appears that an active channel of the Red River actually flowed along the wheat field bank until 1908 when the channel moved eastward approximately one-half of a mile as the result of a major flood. Under these circumstances, the movement of the river was an avulsion and did not effect a change in the boundary line which remained along the wheat field bank. *See Nolte v. Sturgeon,* 376 P.2d 616 (Okl.1962); *Mapes v. Neustadt,* 197 Okl. 585, 173 P.2d 442 (1946); *Goins v. Merryman,* 183 Okl. 155, 80 P.2d 268 (1938); *Willett v. Miller,* 176 Okl. 278, 55 P.2d 90 (1935); *Cherokee South Corp. v. Ledford,* 603 P.2d 351 (Okl. App.1979); *State ex rel. Commissioners of the Land Office v. Seelke,* 568 P.2d 650 (Okl.App.1977); *see also* R. Musser, *Easy Come, Easy Go, or Avulsion Plus Accretion*

3. The extensive data in evidence before the Court pertaining to the volume of water discharged by the Red River indicates that the Red River experiences extremely wide yearly, monthly and even daily fluctuations in flow. For example, the mean annual discharge of yearly average flow varies from under 1,000 cubic feet per second to approximately 10,000 cubic feet per second. During periods of normal flow, the discharge has been as low as 200 cubic feet per second to over 33,000 cubic feet per second. During severe flooding such as that experienced in 1935, 1941 and 1957, the discharge rate has exceeded 140,000 cubic feet per second for short periods.

Major floods which overflowed the permanent banks of the Red River and inundated the wheat field occurred in 1935, 1941 and 1957, and the water almost reached the top of the wheat field bank in the fall of 1972. When the discharge rate is between 20,000 cubic feet per second and 30,000 cubic feet per second, almost all of the disputed land is under water and a virtually unbroken expanse of water extends from the Oklahoma bank to the wheat field bank. A discharge rate of 13,000 cubic feet per second or more is sufficient to inundate major portions of the disputed land and has been equalled or exceeded on forty-five days in a flood year, on twenty-five to thirty days in years of high average flow without floods and on ten to fifteen days in years of low average flow. In 1979, the latest year for which full discharge data is available and a year of below average annual flow, substantially all of the disputed land was under water for several days.

*Does Not Equal Revulsion,* 48 O.B.A.J. Q–177 (1977). After a further avulsive movement of the channel in 1935, the channel was artificially confined along the Oklahoma bank and has been stabilized there by the construction of the bridges and related embankment and the continuous bank stabilization projects so that the active water course has been prevented from actually washing the wheat field bank more frequently in recent years and vegetation has been allowed to grow relatively undisturbed on the disputed land.

In summary, the Court finds and concludes that the "wheat field bank" is the south (west) bank of the Red River as defined by *Oklahoma v. Texas, supra,* 260 U.S. at 636, 43 S.Ct. at 226, and thus is the boundary between Oklahoma and Texas. The movement of the active channel away from the "wheat field bank" was primarily the result of an avulsion in 1908 and a further avulsion in 1935. Accordingly, the Court also concludes that the disputed land was not added to the land of Defendants Langford on the south (west) bank of the Red River by accretion or reliction as said Defendants contend.[4]

■ Turning to the contention of Defendants Langford that they have acquired title to the disputed land by adverse possession, the Court determines that as the land in question is situated on the Oklahoma or north (east) side of the boundary bank, the law of Oklahoma controls the question of adverse possession. *Christ Church Pentecostal v. Richterberg,* 334 F.2d 869 (10th Cir.1964), *cert. denied,* 379 U.S. 1000, 85 S.Ct. 719, 13 L.Ed.2d 702 (1965). In this connection, 60 Okla.Stat.1971 § 333 provides:

"Occupation for the period prescribed by civil procedure, or any law of this State as sufficient to bar an action for the recovery of the property, confers a title thereto, denominated a title by prescription, which is sufficient against all."

12 Okla.Stat.1971 § 93(4) limits an action for recovery of real property to fifteen years.

■ In order to establish title to land by adverse possession in Oklahoma, the possession must be open, visible, continuous and exclusive, with claim of ownership such as will notify parties seeking information upon the subject that the premises are not held in subordination to any title or claim of others, but against all titles and claimants. *Christ Church Pentecostal v. Richterberg, supra; Douglas-Guardian Warehouse Corp. v. Jordan,* 452 F.Supp. 558 (E.D.Okl.1978); *Sears v. Oklahoma,* 549 P.2d 1211 (Okl. 1976). The determination of what constitutes adverse possession depends upon the circumstances of each particular case and should take into consideration the situation of the parties, size and extent of the land, and the purpose for which it is adopted. *Douglas-Guardian Warehouse Corp. v. Jordan, supra; Seigle v. Thomas,* 627 P.2d 417 (Okl.1981); *Sears v. Oklahoma, supra.* However, the proof must be clear and positive on the constituent elements of actual, open, notorious, exclusive and hostile possession for the statutory period. *Douglas-Guardian Warehouse Corp. v. Jordan, supra; Kouri v. Burnett,* 415 P.2d 963 (Okl. 1966); *Loris v. Patrick,* 414 P.2d 249 (Okl. 1966); *Norman v. Smedley,* 363 P.2d 839 (Okl.1961). Every presumption is in favor

---

4. In their proposed findings of fact and conclusions of law filed in this case, Defendants Langford ask the Court to find that the doctrine of acquiescence applies in this case and thereby renders ineffective any avulsion that may have occurred. However, the Court is not persuaded that the doctrine of acquiescence is applicable under the facts of this case as the evidence before the Court does not establish acquiescence by the State of Oklahoma in a long and uninterrupted assertion of dominion and jurisdiction over the disputed areas by the State of Texas. *See California v. Nevada,* 447 U.S. 125, 100 S.Ct. 2064, 65 L.Ed.2d 1 (1980) (boundary acquiesced to by bordering states for more than 100 years); *Ohio v. Kentucky,* 410 U.S. 641, 93 S.Ct. 1178, 35 L.Ed.2d 560 (1973) (boundary acquiesced to by bordering states for more than 150 years); *Arkansas v. Tennessee,* 310 U.S. 563, 60 S.Ct. 1026, 84 L.Ed. 1362 (1940) (boundary acquiesced to by bordering states for more than 100 years); *Indiana v. Kentucky,* 136 U.S. 479, 10 S.Ct. 1051, 34 L.Ed. 329 (1890) (boundary acquiesced to by bordering states for more than 100 years).

of a possession in subordination to the rightful owner. *Mason v. Evans,* 410 P.2d 534 (Okl.1966); *Norman v. Smedley, supra.*

In the instant case, the evidence before the Court indicates that around 1968, Defendants Langford constructed a north-south fence across the middle of the disputed land. About the time this fence was built, Defendants Langford began to run cattle in the fenced area east of the wheat field. Also at this time, Defendants Langford ran some cattle in the portion of the disputed lands east of the newly-constructed fence, but this was discontinued in 1976. Prior to construction of the fence, Defendants Langford allowed their cattle to roam over all of the disputed land and made no effort to keep cattle belonging to other people out of the disputed area. In addition to the foregoing, there is evidence before the Court that Defendants Langford executed oil and gas leases in 1929 and 1977 which may have covered the disputed lands. However, there is no evidence that oil or gas was ever produced pursuant to either lease.

Upon consideration of all of the evidence before the Court, the Court determines that all of the elements of adverse possession have not been established by Defendants Langford by the requisite clear and positive proof. At best, the evidence establishes that the disputed land was subjected to occasional use by Defendants Langford and others for limited grazing purposes to an extent insufficient to establish adverse possession. This use appears to have been an open range type of use. Use of some of the disputed land by Defendants Langford by grazing cattle thereon under fence was not accomplished for the prescriptive period of fifteen years but only from 1968 to 1975 when Plaintiffs filed this action, a period of only seven years. Furthermore, as there apparently has been no actual production of oil and gas from the disputed land continuing for the fifteen-year statutory period,

Defendants Langford have not acquired title by adverse possession of minerals separate from the surface of the disputed land. *Mohoma Oil Co. v. Ambassador Oil Corp.,* 474 P.2d 950 (Okl.1970); *Hassell v. Texaco, Inc.,* 372 P.2d 233 (Okl.1962). Therefore, the Court finds and concludes that Defendants Langford have not acquired title to the disputed land, or the minerals underlying the same, by adverse possession under Oklahoma law.

Turning to the claim asserted by the Plaintiffs and Commissioners against the United States to ownership of that part of the river bed lying between the medial line and the south (west) bank of the Red River in Section 13,[5] the Court determines that the ownership of the river bed in this area was conclusively established in 1923 by the United States Supreme Court in the *Oklahoma v. Texas* litigation, *supra,* wherein the Supreme Court concluded that as to the portion of the Red River located between the 98th meridian of west longitude and the mouth of the North Fork of the Red River,[6] "[t]he full title and ownership of so much of the bed of the river as lies south of its medial line are in the United States." *Oklahoma v. Texas,* 261 U.S. 345, 346, 43 S.Ct. 377, 378, 67 L.Ed. 689 (1923); *see Bradford v. United States ex rel. Department of the Interior,* No. CIV–77–0257–D (W.D.Okla., Dec. 8, 1978), *appeal docketed,* 651 F.2d 700 (Tenth Cir., 1979).

Under the general rule in Oklahoma and elsewhere that one is presumed to convey all he owns in a tract of land unless he appropriately reserves in a conveyance thereof some part to himself or there is clear indication of a contrary intention from the terms of the grant and the attendant circumstances, *see* 16 Okla.Stat.1971 § 29; *Whitman v. Harrison,* 327 P.2d 680, (Okla. 1958); *Rose v. Cook,* 207 Okl. 582, 250 P.2d 848 (Okl.1952); *Choctaw and Chickasaw Nations v. Seay,* 235 F.2d 30 (10th Cir.1956), *cert. denied* 352 U.S. 917, 77 S.Ct. 216, 1

5. Plaintiffs and Commissioners do not make this claim as to Section 24 but only claim to the medial line of the Red River opposite Section 24.

6. It is undisputed that Section 13 (and also Section 24) is located between the 98th meridian and the mouth of the North Fork of the Red River.

L.Ed.2d 123 (1956), and also because Section 13 was conveyed to Oklahoma as school land, the Plaintiffs and Commissioners urge that the United States conveyed the south half of the Red River bed opposite Section 13 by the Oklahoma Enabling Act of June 16, 1906, 34 Stat. 267, when it conveyed Section 13 without limiting the south (west) boundary thereof in such conveyance to the medial line of the Red River; that as the United States then owned Section 13 and the land adjoining it to the south (west) bank of the Red River, it being a riparian section, it conveyed all such land in its conveyance to Oklahoma.[7]

However, the United States Supreme Court considered such Act (and presumably the pertinent school land provisions made by the United States Government) in the *Oklahoma v. Texas* litigation. In that litigation Oklahoma claimed title and ownership from the medial line to the south bank of the Red River for the entire stretch of the Red River between the 98th meridian and the mouth of the North Fork of the Red River. Plaintiffs and Commissioners who hold under or by conveyance from Oklahoma make the same claim herein as to the river bed opposite Section 13. The claim of Oklahoma in the *Oklahoma v. Texas* litigation was all inclusive as to the south half of the river bed between the two designated points. Oklahoma's claim was rejected by the United States Supreme Court which found full title and ownership of the river bed south of the medial line to be in the United States (and not in Oklahoma or Texas) between the two designated points. As Oklahoma's claim in that litigation failed so must Plaintiffs' and Commissioners' identical claim made in this litigation as to Section 13 also fail.

Therefore the Court finds the claim of Defendant United States to ownership of the Red River bed from the medial line to the south (west) bank opposite all lands in *both* Sections 13 and 24 as trustee for certain Indian Tribes to be meritorious.

In view of the foregoing, the Court finds and concludes that the boundary between Oklahoma and Texas in the disputed area involved in this case is along the "wheat field bank" which is the south (west) bank of the Red River in this area; that the land or any part thereof lying between the "wheat field bank" and the present active course of the Red River has not been acquired by Defendants Langford by adverse possession; that the Defendant United States is the owner of the Red River bed from the medial line thereof to the south (west) bank in both Sections 13 and 24; that Plaintiffs are the owners of the surface of the Red River bed from the medial line thereof to the north (east) bank in both Sections 13 and 24; that the intervening Plaintiffs are owners of the minerals in the Red River bed from the medial line thereof to the north (east) bank in Section 24 and the Commissioners of the Land Office, State of Oklahoma, are the owners of the minerals in the Red River bed from the medial line thereof to the north (east) bank in Section 13. Accordingly, the Court directs Plaintiffs to prepare a proposed Judgment consistent with the foregoing and to circulate the same among the other parties to this case for approval as to form whereupon Plaintiffs are further directed to submit the same to the Court for filing herein within fifteen (15) days from this date.

---

**7.** It appears from the *Oklahoma v. Texas* litigation that the United States Supreme Court reached the conclusion that the United States in its various conveyances of the land north of the Red River and located between the 98th meridian and the mouth of the North Fork of the Red River to Indian Tribes, by allotments to Indians, by patents to white settlers and to Oklahoma when it became a State had demonstrated a clear intention not to convey the south half of the river bed and limited such conveyances to the medial line of the river.